**UNITED STATES of America,
Appellant,**

v.

**Roland W. BROWN.**

**No. 71–1568.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 6, 1972.

Decided Sept. 13, 1972.

As Amended Sept. 13 and Oct. 2, 1972.

**420**

Mr. Henry F. Greene, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry, and John F. Evans, Asst. U. S. Attys., were on the brief, for appellant. Mr. Harold H. Titus, Jr., U. S. Atty., also entered an appearance for appellant.

Mr. Walter R. Choroszej, Washington, D. C. (appointed by this Court), for appellee.

Before Mr. Justice CLARK * of the Supreme Court of the United States, and LEVENTHAL and ROBB, Circuit Judges.

Mr. Justice CLARK:

Roland W. Brown, defendant-appellee, stands charged with eight co-defendants in a multiple count indictment alleging violations of the federal narcotics laws. The indictment is based upon the seizure by police officers of a cache of narcotics and paraphernalia from a Vermont Avenue apartment in the District of Columbia where Brown was spending the night with a friend. The entry into the apartment and the seizure were made on the authority of an arrest warrant that the officers were attempting to execute on Brown, charging him with first degree murder.

The District Court sustained a motion to suppress the proceeds of the seizure on the grounds that the officers did not have probable cause to believe that Brown was in the apartment; and even if they did, the law requires a search warrant prior to entering a residence other than that of the suspect, absent exigent circumstances preventing the obtaining of a search warrant.[1]

We find that under the peculiar circumstances here that the officers had reason to believe that Brown was in the apartment and that it was, therefore, not necessary to secure a search warrant. We therefore reverse the judgment and remand the case for trial.

1. *The Facts:*

On March 17, 1969, police officers obtained an arrest warrant for Brown, charging first degree murder but they were unable to locate him. They checked the usual sources, such as relatives, friends and hang-outs without success. They contacted a source "connected with the same operation as Mr. Brown was involved in" and were told that Brown's number-one girl friend, Nadine Brooks, who was "small, very good looking, with short hair, a light-skinned Negro" lived near Thomas Circle, N.W. This information was consistent with other information that the informant had given in the past and was considered reliable. However, a canvass of the apartments and mail boxes near Thomas Circle, N.W., failed to reveal a "Nadine Brooks". A further check was made of police records —including Detective Riggs' notebook—

---

* Sitting by designation pursuant to Title 28, U.S.C. Section 294(a).

1. The appeal is laid under 18 U.S.C. Sec. 3731 granting jurisdiction on interlocutory appeals in certain matters.

and the latter had a notation that Brown's "number one girl friend" was "Nadine Frazier" rather than "Nadine Brooks". The Officers again checked the apartments and mail boxes near Thomas Circle, N.W., and discovered an apartment and mail box in the name of "Nadine Frazier" at 1239 Vermont Avenue, Apartment 907. The Officers displayed a series of photographs of various suspects involved in the murder investigation to the security guard of the apartment building located at 1239 Vermont Avenue, N.W. He identified one of the photographs as being a party that he sometimes observed frequent the building in company with Miss Frazier. The party was Brown. The guard's description of Miss Frazier matched that given by the earlier informant for "Nadine Brooks," i. e., "a short, light-skinned, short-haired, very attractive Negro young lady." On the next day—March 24—the Officers returned to the Vermont Avenue apartment building and interviewed the resident-manager. She showed them a layout of the building and the location of Apartment 907 together with the general location of its windows on the outside of the building. She could not assist them with reference to the inside of Apartment 907 because the occupant had put a private lock on the door and the manager had no key to the latter.

The Officers then established a surveillance of the Vermont Avenue apartment building. On March 24, 1969, Detectives Riggs and Chaillet of the Homicide Squad parked their car on the north side of Vermont Avenue just northeast of N Street and began to observe the entrance to the apartment building at 1239 Vermont Avenue and at the same time the general area of the windows in Apartment 907 of the building. They would park for a while and then cruise up and down 14th Street, N.W., always returning to the approximate spot where they had parked previously. The weather was very bad; it was raining and misty. Between 11:00 and 11:30 p. m. the Officers observed two men—one a tall Negro and the other a very short Negro—walking diagonally across the intersection from the north corner of Vermont to the south corner on which the apartment building was located. The two men approached the entrance to the apartment building and opened its front door by means of their personal key. After entering, the Officers lost sight of the men in the lobby "until a short time later a light came on in the window in the vicinity of which we thought was Apartment 907." While both Officers concluded that they "had no reason to believe that that was the particular subject [Brown] we were interested in" at the time the tall and short men entered the apartment building, the Officers testified that "the fact that the lights in the vicinity of Miss Frazier's apartment came on a short time later gave us, we felt, some instance [assurance] to believe that he was in there."

The Officers did not enter the apartment building at this time. Their tour of duty was over at midnight and they reported to police headquarters. They told their superior, Sergeant Crooke, that "there was a good possibility that Mr. Brown was in Nadine Frazier's apartment." They also advised him that two or three days earlier Detective Morris had told them that he had received information that Brown had been seen in the area of the 2600 block of Douglas Road, S.E.; that they had checked the No. 11 precinct office and found a complaint on a stolen bicycle at 2621 Douglas, S.E. While investigating it, they inquired about Brown and noticed a mail box in the lobby of that building with the letters RAB scratched on its surface, which might refer to "Rabbit" which was Brown's nickname. The Officers told Sergeant Crooke that Brown "would very possibly be at either of these two locations."

Sergeant Crooke decided to raid both locations at 5:20 a. m. The evidence indicates without any contradiction that early morning is the best time to apprehend a fugitive, especially a dangerous one, like Brown, who is believed to be

armed. As Sergeant Crooke put it: "When we are looking for a person . . . if we think he is at a location we try to get there at a point [of time] when things are quiet, and he might be asleep and chances of escape would be less. It is the best opportunity to find a person at the place if he is going to be there." Other Officers also pointed out that there is less danger to the public since the streets are usually deserted and that the danger to the Officer himself is less and the surprise to the subject is the highest.

Sergeant Crooke dispatched Detective Norman and two Officers to the 2621 Douglas Street, S.E., address and he, himself, took three Officers to Apartment 907 at 1239 Vermont Avenue, N.W. Detective Norman found no evidence of Brown at the Southeast address. Sergeant Crooke, with his detail, arrived at Apartment 907 at 5:20 a. m. They knocked on the door of the apartment and a female voice inquired who was at the door. Detective Alexander identified himself as a police officer. The female voice replied, "Wait, I am getting dressed." The Officers waited two or three minutes and knocked once again. Sergeant Crooke said, "Open up, we have a warrant for Rabbit." The female voice asked, "Who?", and Sergeant Crooke replied "Roland Brown." The female voice again asked the police to wait. The Officers waited for another two or three minutes and Sergeant Klopfer pounded loudly on the door and said that if it was not opened it would be forced. During the period while they were waiting [Miss Frazier estimated it as 10 minutes] the toilet was heard flushing twice from inside the apartment. Finally at about 5:30 a. m. the door was opened by Miss Frazier. Sergeant Crooke displayed his identification folder as he and Detective Alexander entered. A man subsequently identified as Albert Westbrook was sitting in a chair;

Brown was partly hidden behind the window draperies.[2] Detective Alexander called out to him, "Hold it, Rabbit." Brown quickly ducked out the window and Detective Alexander observed him as he descended from a railing outside the apartment window to the floor below. Brown made his escape through the lower apartment. Three of the Officers ran below in an effort to intercept Brown while Sergeant Crooke remained in the apartment with Miss Frazier and Westbrook. Detectives Alexander and Klopfer returned in a few minutes, unsuccessful in their pursuit. Since Brown was known to be both dangerous and usually armed, Detective Alexander was interested if he left his arms behind in his flight and so he looked under the two pillows on the bed. A .25 caliber automatic pistol was under one of the pillows. Detective Alexander also observed several boxes marked "gelatin" along with some traces of white power and two spoons in plain view on the table.

Prior to Detective Alexander's return to the apartment, Sergeant Crooke had asked Westbrook to show his identification and when the latter pulled out his wallet and opened it, the Sergeant saw a glassine envelope containing white powder. Westbrook admitted that it was cocaine. Westbrook was placed under arrest. An open brief case on the floor had measuring spoons and additional glassine envelopes in plain view.

Since the detail of the contraband found in the apartment has no relevance to the issue here, it is sufficient to say that Miss Frazier, upon advising that she maintained the apartment, was placed under arrest. Upon search, two tinfoil packets of white powder were found secreted around Miss Frazier's waist and some additional powder was pointed out by Miss Frazier in a blue dinner plate under the bed.[3]

2. The apartment was one bedroom with bath.

3. Miss Frazier testified that she was in the bathroom when she heard the first

knock of the Officers; that she awakened both Brown and Westbrook and the former dressed quickly as she did secreting some narcotics around her waist and hiding some under the bed.

## 2. *The Law of the Case:*

■ (a) The parties seem to agree that the standards to be applied for the execution of an arrest warrant at a residence of a third party [4] not named in the warrant is the reasonable belief of the Officer that the person named in the warrant is present in the third party's residence. This has been the announced rule in the District of Columbia since 1963. In Palmer v. United States, 192 A.2d 801, the District of Columbia Court of Appeals held:—

> "An officer with a warrant outstanding for the arrest of an individual named therein may enter upon private premises if he has reasonable cause to believe that such party can be found there." At 803.

Likewise, the United States District Court for the District of Columbia [Gasch, J.] held in 1969 that an Officer seeking entry in order to effect an arrest must have reasonable cause to believe that the defendant is within the premises the Officer seeks to enter. United States v. Watson, D.C., 307 F. Supp. 173, 175. And this Court itself has approved that principle, implicitly at the least, in Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) in an *en banc* opinion canvassing in detail the various facets of the problem and approving a warrantless entry into a suspect's home for the purpose of effecting his arrest. And, the Supreme Court has given similar approval in Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958) framed in the form of a rhetorical question, "Whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought . . . ." [5]

Rule 4(b)(1) also supports this position when it commands that once an arrest warrant issues the defendant may be arrested at any place within the jurisdiction of the United States.

■ (b) It is not disputed that the sole purpose of the Officers here in entering Miss Frazier's apartment was to arrest Brown, not to search. Brown had been a fugitive for five months. The Officers had diligently sought his arrest. They had learned from a reliable informer that Brown had a "number one girl friend" who lived near Thomas Circle. The Officers sought out her apartment and found it; they found out that Brown frequented the apartment with Miss Frazier; they surveilled the apartment building and saw a tall Negro and a small Negro enter the apartment building with a private key about 11:30 p. m. on March 25; the Officers saw the lights in the area of Miss Frazier's apartment "light up" soon afterwards; they knew that Brown was selling narcotics and they had narrowed his presence on March 25th to two locations; i. e., Miss Frazier's apartment and 2621 Douglas Street, S.E.; that the Officers checked both locations at 5:30 a. m. on March 25th; that Miss Frazier delayed permitting the Officers to enter for some 10 minutes although the Officers announced their presence three times, one of which was "Open up, we have a warrant for Rabbit" and Miss Frazier asked "Who?" and the Officer said "Roland Brown"; and at no time did Miss Frazier indicate Brown was not present in her apartment.

The District Court found that the Officers did not have probable cause to believe that Brown was in the apartment at the time they knocked on the door.

---

4. The government concedes that Brown has standing to challenge the validity of the entry of the police officers into Miss Frazier's apartment. See Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697.

5. While the Fourth Circuit left the question open in Lankford v. Gelston, 364 F.2d 197, 205–206 (1966), it held that "where the belief that the person is on the premises is based only on an anonymous tip and hence without probable cause" entry was not permissible.

We would agree that the wait from 11 p. m. to 5 a. m. diminished to some indeterminate extent the likelihood that Brown was still in the apartment. But we do not think it diminished that premise to such an extent as to condemn the police action as lacking in probable cause—which is essentially a concept of reasonableness. It is material that what the police were executing was a warrant to arrest a dangerous, usually armed man who was involved in a narcotics operation and was wanted for murder; and it was reasonable, in terms of prudent police action and the avoidance of the dangers attendant on armed resistance, to wait for the quiet hours to enter the apartment of his best girl friend, and to presume that he had stayed on from 11 p. m. to 5 a. m. There was therefore probable cause for them to enter that apartment to search for Brown, and to require the resident to open the door for that purpose. The reasonableness of their action is further attested by the manner of entry. This was not a "no knock" breaking into an apartment at 5 a. m. We do not think the interest of privacy protected by the Constitution was unreasonably impaired.

### 3. *Other Contentions:*

Brown seeks to cast doubt on the reliability of the Officers' informers. This challenge has no support. While the informer who advised the Officers of Brown's "number one girl friend" gave the name Nadine *Brooks,* the Officers checked this out and found her correct name to be Nadine *Frazier.* The remainder of the information was correct. The security guard and the apartment manager were certainly reliable and helpful. The other information from "the street," etc., was all run down and played no part in the final episode.

Brown also places great emphasis on the testimony of Officer Riggs that he "had no reason to believe that [the TALL NEGRO and SHORT NEGRO entering the apartment building] was the particular subject we were interested in" [Brown]. But this is taken entirely out of context. Officer Riggs was referring to his belief at the time these men entered the building, but when the lights came on in Miss Frazier's apartment he said this gave him assurance that the short Negro was Brown.

■ The claim is also made that the six hours elapsing between the time the tall and short Negroes entered the apartment building, and the time of the Officers' entry into Miss Frazier's apartment, gave ample time to the Officers to get a search warrant. The arrest warrant issued under Rule 4(c) provides authority to enter any premises for the purpose of enforcing the warrant, if the officer has probable cause to believe that the subject is located therein. There is no general requirement for a search warrant under Rule 41, in addition to an arrest warrant, even assuming there was sufficient time to obtain one; though if a magistrate is asked for and issues a search warrant that would be material in establishing the existence of probable cause and government need for invasion of the privacy of the premises—especially if it expressly authorized entry of a home at night—that undercuts any claim that the entry was unreasonable and unconstitutional.[6] Here

---

6. There can be no doubt that the police acted reasonably as to the method of effecting entry in announcing, as they did here, that the door would be forced if not opened. The sequence of events ran as follows: The police knocked, and, when a female asked who was there, identified themselves as the police; the female then said, "wait, I'm getting dressed"; after a couple of minutes the police knocked again and said, "open up, we have a warrant for Rabbit"; the female asked, "who" and the police replied, "Roland Brown"; the female again asked them to wait; the police waited another couple of minutes and then pounded on the door saying that it would be forced, if not opened. During this long waiting period the police heard the sound of a toilet flushing, which may have an innocent significance at 5 a. m. Still, the government is correct in suggesting that this is the kind of event that can be taken into account, when, as here, the police have a

there was probable cause to believe Brown was on the premises.

For the reasons specified, the judgment of the District Court is reversed and the cause is remanded for trial.

warrant to arrest someone they have reason to believe is "involved in a narcotics operation." (Tr. of March 25, 1971, pp. 14, 16.)