**Tyrone E. DAVENPORT, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 2885.

Supreme Court of Alaska.

Sept. 2, 1977.

James L. Johnston, Opland & Johnston, Anchorage, for appellant.

Glen C. Anderson, Asst. Dist. Atty., and Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and BURKE, Justices.

## OPINION

BOOCHEVER, Chief Justice.

Tyrone Davenport was convicted by a jury of receiving or concealing stolen property in violation of AS 11.20.350 and was sentenced to eighteen months imprisonment to run concurrently with his other sentences imposed for prior convictions.[1] This offense occurred while Davenport was on parole for receiving and concealing, assault with a dangerous weapon and a felon in possession.

On appeal, Davenport challenges the superior court's refusal to suppress evidence.

Although the evidence was seized pursuant to a search warrant, Davenport claims the evidence was discovered during an illegal attempt to execute an invalid arrest warrant. Davenport thus raises two questions:

(1) Is an arrest warrant for a parole violator invalid if not supported by sworn complaint or affidavit?

(2) Did the police have probable cause to enter and search the apartment of a third person in an attempt to execute the parole violation warrant?

Additionally, the state appeals from the sentence contending that it was too lenient.

We have concluded that the arrest warrant was valid, that there was probable cause to enter the apartment and search it to the extent necessary to execute the parole violation warrant, and that the sentence was too lenient insofar as it was imposed to run concurrently with the other sentences.

## I. STATEMENT OF THE FACTS

During late May, June and early July of 1975, Carroll Smith, Davenport's parole officer, received information that Davenport had been associating with known felons, that he may have been involved in two burglaries in the Anchorage area and that he had made death threats against two police investigators. This information was provided by Lyle Davis of the Anchorage Police Department, who had been investigating a series of burglaries, and by Bob Clemens, another policeman. Smith did not act on this information, however. In each instance, he asked for proof of the alleged activity. Since none was offered, he felt he did not have "anything [he] felt strong enough to issue a warrant on and wanted to give [Davenport] the opportunity to demonstrate himself." According to Smith, all contacts between the police and himself had been initiated by the investigators; and

---

1. Davenport was subsequently convicted as an habitual criminal under AS 12.55.050(3). Pursuant to AS 12.55.060(a), the eighteen-month sentence was vacated, and Davenport was sentenced to serve five years. On appeal to this court, the five-year sentence was vacated, and the eighteen-month sentence reimposed because of inapplicability of the habitual criminal statute. *State v. Carlson*, 560 P.2d 26 (Alaska 1977).

between July 1 and 14, he had received approximately three calls from Davis. Smith stated that Davis had asked what action might be taken on the case and whether a warrant might be issued. Davis, however, denied having made a specific request for a warrant.

On July 14, 1975, Rev. Lyons of the parole board issued a parole violation warrant for the arrest of Davenport. The state does not deny the fact that no written complaint or affidavits were submitted in support of this warrant. It was requested and prepared by Smith and signed by Rev. Lyons on the basis of Smith's oral statements that: (1) Davenport had failed to report to Smith in writing during the first two weeks of July; (2) Davenport had failed to advise Smith of a change in employment and had misled Smith into believing he was employed when, in fact, he was not and (3) Davenport had been associating with known felons. Smith had earlier communicated his concerns relating to Davenport's employment and his association with felons to the head of the parole board in writing. Additionally, he had commented on the alleged criminal activity.

The signed warrant was placed in Davenport's file. At noon on July 14, Smith called Officer Clemens and informed him that the warrant had been issued, that it was active and that if the police were in contact with Davenport, they could legally arrest him. Neither Clemens nor Davis had asked to be contacted when the warrant was issued. Smith's call was made pursuant to the "general practice" of advising the police of active warrants.

After receiving notice of the warrant, Davis and two other policemen proceeded to the residence of Lillian White. Four days earlier, Davis had been advised by an informant that Davenport was "going" with Ms. White and had been staying with her. Davis had not, however, watched the apartment in the interval to verify the informa-

tion. The informant had given information in the recent past, but Davis had not previously tested his credibility or reliability.

Additional information provided by the informant in this case consisted of the following facts: (1) White and her husband had separated, and her husband was a school teacher of some sort; (2) Davenport had been riding in Ms. White's car and another car, a late model Cadillac of dark color which was "being kept away from" Ms. White's apartment and (3) Davenport had been making threats on Davis' life.

Davis testified that Davenport had been observed at several different locations in Anchorage, but that these were not permanent or semi-permanent addresses. He did not believe that Davenport had been staying at his father's home in Anchorage. Although Davis had never knocked on the door, he had been by that location a number of times and had failed to observe the vehicle which Davenport was reported to have been using.

Davis and the two other officers arrived at Ms. White's residence at approximately 2:00 p. m. They knocked on the door of her apartment and heard music in the background, but there was no response. Judy Smith, who lived across the hall, came to her door and was questioned by Davis. She stated that the apartment at which the police had been knocking was that of Lillian White and that Lillian had left some hours before.[2] She further told the police that when Lillian was leaving, she had seen a Negro male in the doorway of the apartment. According to Davis, the description matched that of Davenport. Ms. Smith indicated that she didn't know whether or not the man was still there. Davis testified that she also told the police that music had been coming from the apartment when Ms. White had left. Finally, Ms. Smith informed Davis that she had seen Davenport on several occasions, perhaps six or seven times at various times of the day. She did

2. Davis testified that Ms. Smith had told him she had seen White leave two hours before. At trial, however, she stated that this had occurred at approximately 10:00 a. m., about four hours before the police arrived. The trial court discounted this inconsistency and gave a high degree of credence to Davis' testimony.

not know whether or not he lived at the apartment with Ms. White.

Having knocked loudly on Ms. White's door several more times and receiving no response, Officer Davis used Ms. Smith's telephone to contact the building manager, Ms. Holding. He informed her that he had a warrant for Davenport's arrest and requested a key to the apartment. Ms. Holding testified that she told Davis that she had seen Davenport and Ms. White leaving the apartment together the previous afternoon.

On entering the apartment, the police immediately commenced a search for Davenport and inspected the rooms and the closets. In checking the closet in the bedroom which, according to Davis, was large enough to hold ten to fifteen people, Davis observed several video recording items which he recognized as having come from a burglary which occurred two weeks previously. An additional item was observed on top of a clothes hamper in the bedroom. Davis testified that he was "astonished" to find the items in the apartment, since, in his experience, stolen items were usually quickly disposed of.

On the advice of the District Attorney, whom he had contacted by phone, Davis secured the apartment and obtained a warrant in order to seize the allegedly stolen goods.

On July 15, Davenport was arrested at the office of the parole board. He had

apparently come to the office under his own motivation to report to his parole officer.

At trial, Davenport moved to suppress evidence which had been seized pursuant to the search warrant. The trial court denied his motion. It found that:

> The warrant authorizing apprehension and detention of the defendant Davenport appears to have been in keeping with the appropriate provisions of the Parole Administration Act [AS, Title 33, Chapter 15]. It is not this court's function at this time to second-guess the parole board or a member thereof.

The trial court found that the officers conducting the search for Davenport had probable cause to believe that Davenport was in White's apartment at the time that they entered.

This appeal followed.

## II. VALIDITY OF THE PAROLE VIOLATION WARRANT

■ The warrant for Davenport's arrest as a parole violator was issued in accordance with the provisions of AS 33.15.200.[3] Davenport contends, however, that a parole violation warrant is invalid if it is not supported by a written affidavit or complaint. His argument rests on the provisions of the fourth amendment of the United States Constitution [4] and art. I, sec. 14 of the Alaska Constitution,[5] which require a showing of probable cause supported by oath or af-

---

3. AS 33.15.200 states:
 *Retaking of parole violator.* A warrant for the retaking of a state prisoner who violates his parole may be issued only by the board or a member of it and the warrant shall issue within the maximum term or terms to which the parolee was sentenced. A parole violator may be retaken with or without a warrant for violation of a term of parole. The unexpired term of imprisonment of the parolee shall be served and begins to run from the date he is returned to the custody of the commissioner under the warrant, and the time the prisoner was at liberty on parole does not diminish the time he was sentenced to serve.

4. The fourth amendment to the United States Constitution states:
 *Searches and seizures.* The right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

5. Art. I, sec. 14 of the Alaska Constitution states:
 *Searches and Seizures.* The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

firmation before warrants may be issued and on the requirements of due process.[6] Davenport concedes that the provisions of Criminal Rule 4(a)(1) are not at issue,[7] and he does not raise issues concerning the quantum of cause required for the warrant.

In *State v. Sears*, 553 P.2d 907 (Alaska 1976), this court held that, ordinarily, neither the Alaska Constitution nor its criminal rules bar the use of illegally-obtained evidence in parole revocation proceedings. The evidence obtained as a result of the attempt to serve the warrant on Davenport, however, was used in an independent criminal case. The extent of protections accorded a parolee in connection with a parole violation warrant and subsequent arrest present questions of first impression.

Since the United States Supreme Court decision in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which extended certain procedural protections to parolees facing revocation, issues involving the constitutional rights of released offenders have been of increasing concern to courts and commentators. For the most part, the reported decisions and analyses in the fourth amendment area focus on the applicability of the traditional probable cause standard to searches and seizures of parolees and probationers by correctional authorities. Considerable attention has also been given to the validity and effect of parole or probation release conditions requiring consent to searches.[8]

There are few cases, however, addressing the need for sworn affidavits to support a parole arrest warrant. One such case is *People v. Anderson*, 49 Cal.App.3d 869, 123 Cal.Rptr. 209 (1975). There, the California Court of Appeals for the Fourth District found the trial court had erred by refusing to permit inquiry into the probable cause for issuance of the arrest warrant. While holding that such warrants were invalid unless based on probable cause, it stated:

> We would not go so far as the defendant suggests and rule that the warrant have appended to it as an affidavit or declaration, a statement of the cause on which the warrant was issued. Since *this was an administrative warrant, not a judicial warrant*, if the administrator wishes to come into court and testify (as in this case) as to the cause on which the warrant was issued, principles of due process have been satisfied. (emphasis added) 123 Cal.Rptr. at 212.

In support of its conclusion, the *Anderson* court pointed to *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), and *United States ex rel. Randazzo v. Follette*, 418 F.2d 1319 (2d Cir.), *cert. denied*, 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971). While neither of these decisions explicitly upholds administrative warrants

6. Alaska Criminal Rule 4(a)(1), which is identical with Federal Criminal Rule 4(a), provides that:

> (a) *Issuance.*
> (1) *Probable Cause.* A warrant or summons shall be issued by a judge or magistrate only if it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed and that the defendant has committed it.

Under Rule 4(a), it is not enough that the complaining officer have personal knowledge of facts sufficient to show probable cause. He must communicate those facts to the magistrate. This must be done by evidence under oath so that a reviewing court can be sure that the magistrate had an adequate basis for determining that probable cause existed. 1 Wright, Federal Practice and Procedure, § 52 at 38–39; *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

7. This court has held that the Criminal Rules are ordinarily inapplicable to cases involving parole or probation revocation since, for this purpose, these are not "criminal proceedings." *See State v. Sears*, 553 P.2d 907 (Alaska 1976); *Paul v. State*, 560 P.2d 754 (Alaska 1977); *State v. DeVoe*, 560 P.2d 12 (1977); *cf. Morrissey v. Brewer, supra* ("revocation of parole is not part of a criminal prosecution"). Moreover, the fact that Criminal Rule 4(a)(1) is specifically directed to magistrates and judges suggests that it was not intended to control issuance of administrative warrants by nonjudicial personnel.

8. *See generally*, Note, Fourth Amendment Limitations on Probation and Parole Supervision, 1976 Duke L.J. 71 (1976); Note, Search and Seizure Rights of Parolees and Probationers in the Ninth Circuit, 44 Ford.L.Rev. 617 (1975).

issued without supporting affidavits, they do indicate that the strict requirements of the fourth amendment may be inapplicable. In *Abel*, the court implicitly sanctioned the constitutionality of a statute authorizing issuance of administrative warrants for arrest by the Immigration and Naturalization Service whenever "it appears that arrest of the [person] is necessary or desirable." Noting that the conflict between the fourth amendment and the administrative warrant procedure had not been properly raised, it stated that "statutes authorizing administrative . . . proceedings have had the sanction of time." *Id.*, 362 U.S. at 230, 80 S.Ct. at 692, 4 L.Ed.2d at 681.

In *Randazzo*, the court upheld an arrest of a parolee pursuant to a New York "Warrant for Retaking and Detaining a Paroled Prisoner." Deeming the warrant "administrative," it stated that:

> While the safeguards accorded under [New York's] statutory scheme are not as extensive as those required to obtain a warrant for the arrest of an ordinary citizen, they appear to us to be sufficient to provide for the lawful arrest of a parolee. 418 F.2d at 1322.

Thus, it concluded that the warrant could be issued on less than probable cause. There is no indication in the decision that the New York statutes required supporting affidavits.

The constitutionality of parole warrants issued on less than probable cause has been upheld, and the validity of such issuance without supporting affidavits is inherent in the decision of *Alger v. Page County Sher-* *iff's Department*, 408 F.Supp. 978 (W.Va. 1976). The court ordered summary judgment against the plaintiff in a civil suit for damages arising out of an alleged unlawful entry in connection with the service of an arrest warrant. It explained that a warrant issued by a parole officer is not to be judged by the same standards as a warrant for the arrest of a nonparolee charged with a crime.

The authority and persuasiveness of decisions holding or suggesting the constitutionality of parole warrants that do not meet the strict requirements of the fourth amendment should be assessed in light of the various theories analyzing, in more general terms, the constitutional rights of parolees and probationers.

Cases decided in state and federal courts even before *Morrissey, supra,* suggest that a parolee may not be subjected to arbitrary or oppressive invasions of privacy.[9] These cases indicate that only the officer supervising the parolee has authority to search or seize without satisfying the normal requirements of the fourth amendment [10] and that any officer seeking to enter a parolee's premises for the purpose of effecting an arrest must comply with the rules relating to announcement.[11] A number of courts, however, had denied fourth amendment protections where searches and seizures were conducted by correctional authorities. The rationale of these cases was that the released offender is constitutionally entitled to no more liberty than he would have enjoyed had he been incarcerated.[12]

---

9. *See United States ex rel. Randazzo v. Follette,* 282 F.Supp. 10, 13 (S.D.N.Y.1968) (dictum); *People v. Hernandez,* 229 Cal.App.2d 143, 40 Cal.Rptr. 100, 104 (1964) (dictum).

10. *See United States v. Hallman,* 365 F.2d 289, 292 (3rd Cir. 1966) (alternative holding).

11. *See People v. Kanos,* 70 Cal.2d 381, 74 Cal. Rptr. 902, 450 P.2d 278, (1969); *People v. Rosales,* 68 Cal.2d 299, 66 Cal.Rptr. 1, 437 P.2d 489 (1968).

12. The custody theory, explicitly relied on in *Randazzo, supra,* was elaborated in some detail in *People v. Hernandez,* 229 Cal.App.2d 143, 40 Cal.Rptr. 100 (1964), where the court held that a parolee may not assert fourth amendment guarantees against the authorities supervising his parole. It explained:

> [The] standard concepts of arrest and probable cause for arrest have little relevance as between correctional authorities and paroled prisoners. The parolee, although physically outside the walls, is still a prisoner; his apprehension, although outwardly resembling arrest, is simply a return to physical custody. To weigh retaking of a parolee on scales calibrated for arrest and probable cause is to compare incomparables. *The decisive question in this case is not whether the parole officer had probable cause for arrest and incidental search, but whether his parole*

■ The decision in *Morrissey* represented a new judicial concept of the constitutional status of the released offender. Emphasizing that a parolee's status more closely resembles that of an ordinary citizen than a prisoner, the court in *Morrissey* implicitly rejected the custody rationale. It found:

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an.implicit promise that parole will be revoked only if he fails to live up to the parole conditions. 408 U.S. at 482, 92 S.Ct. at 2600, 33 L.Ed.2d at 494–95.

Thus, a parolee has a constitutionally-protected interest in his status.

*Morrissey* did not, however, afford a parolee the "full panoply of rights" available under the fourteenth amendment to other criminal defendants. The Court stated:

> We begin with the proposition that the revocation of parole is not part of a criminal prosecution and thus the full panoply

of rights due a defendant in such a proceeding does not apply to parole revocations. . . . Parole arises after the end of the criminal prosecution, including imposition of sentence. Supervision is not directly by the court but by an administrative agency, which is sometimes an arm of the court and sometimes of the executive. Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions. (citation omitted) *Id.* at 494, 92 S.Ct. at 2600.

The court did not discuss in any detail the requirement for arrest of a parolee. The opinion states, however, that Morrissey was arrested as a parole violator "at the direction of his parole officer." [13] There is no indication that a warrant was obtained, and certainly no implication that any affidavit or sworn complaint was required. The Court simply stated that the termination of a parolee's liberty "calls for some orderly process, however informal." [14] Without disapproval of the initiating procedures, it was stated that "The first stage occurs when the parolee is arrested and detained, usually at the *direction of his parole officer*" (emphasis added).[15] *Morrissey* thereafter· primarily discusses the types of hearings required to afford due process. As far as the initial arrest is concerned, the Court announced no requirement for an affidavit or sworn complaint as would be necessary for the arrest of a non-parolee.

■ In *Latta v. Fitzharris,* 521 F.2d 246 (9th Cir. 1975), a search of a parolee's house was conducted after he had been arrested elsewhere. The search was upheld by a

---

*prisoner could invoke constitutional barriers against the search.* (citation omitted) (emphasis added) 40 Cal.Rptr. at 103.
The court concluded that since inmates of state prisons do not have the usual array of federal and state constitutional rights guaranteed to non-incarcerated citizens, neither do those who are constructively prisoners under the legal custody of the state. For another case relying on the custody theory, *see Rose v. Haskins,* 388 F.2d 91, 95 (6th Cir.), *cert. denied,* 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968).

13. 408 U.S. at 472, 92 S.Ct. at 2596, 33 L.Ed.2d at 489. In the companion case involving G. Donald Booher, arrest was similarly effected at the direction of the parole officer.

14. 408 U.S. at 482, 92 S.Ct. at 2601, 33 L.Ed.2d at 495.

15. 408 U.S. at 485, 92 S.Ct. at 2602, 33 L.Ed.2d at 496.

divided court as the parole officer reasonably believed that the search was necessary in the performance of his duties. The court indicated that the search could even be based on a "hunch," and that no warrant was required.[16] If under the fourth amendment to the federal constitution, a warrant is not required to search the home of a parolee,[17] it would appear to follow that no warrant is required under the same amendment for the parolee's arrest. In fact, counsel has been unable to cite, and our independent research has failed to reveal, any federal case requiring an affidavit or sworn complaint, or for that matter, even the issuance of a warrant for that purpose.[18] We hold that the procedure under which the warrant was issued for Davenport's arrest did not violate the United States Constitution.

■■■ We next must determine whether there was a violation of art. I, sec. 14 of the Alaska Constitution.[19] We believe that a parolee's liberty should be afforded all protections consistent with his status as one convicted of a crime and under supervision and restrictions, although released from incarceration. The conditions placed on a parolee make him subject to arrest for a wide variety of causes which do not apply to others. Violations may result from failure to report to his parole officer; failure to reveal a change of address of employ-

ment; frequenting a bar or, under some circumstances, even driving a car. To impose the same requirements as are otherwise mandated for an arrest including an affidavit or sworn complaint would constitute meaningless additional time and effort on the part of parole officers. Nevertheless, except in cases where exigencies require an immediate arrest, the parole officer should secure a warrant from the parole board or a member of it as provided for in AS 33.15.200. We so construe that statute and base this requirement on the statute rather than Alaska's Constitution. The statutory procedure was followed here. In order for the requirement to be meaningful, the warrant should be issued only upon probable cause of a violation of the conditions of parole being presented to the parole board or a member thereof. It is not contended that the parole officer did not indicate to Rev. Lyons, a board member, that there was probable cause to believe that Davenport had violated the conditions of his parole. We hold that there was no error in the issuance of the warrant.[20]

Nevertheless, to avoid unnecessary appeals from warrants issued on oral statements, the contents of which may be subject to argument, we shall require in the future that a written statement indicating probable cause be filed with the parole

16. 521 F.2d at 250.

17. Since that issue is not before us, we expressly do not decide the requirements for the search of parolee's house other than for the purposes of executing an arrest warrant.

18. Only one state case decided subsequent to *Morrissey* appears to require full fourth amendment protection to released offenders. In *State v. Cullison,* 173 N.W.2d 533 (Iowa 1970), the Iowa Supreme Court ordered evidence secured in a warrantless search of the parolee's home suppressed. The case does not discuss the arrest requirements, and the court specifically confined its holding to seizure of evidence relative to a new and independent criminal action. The search in *Cullison* was made of a locked closet in a locked room without any reasonable grounds for believing it to be necessary.

19. Alaska's search and seizure provision is quoted at Note 5, *supra.* We are charged with the duty of construing the Alaska Constitution-

al provisions which may afford more rights than similar federal provisions. *See Blue v. State,* 558 P.2d 636, 641 n.7 (Alaska 1977).

20. This holding is in accord with our prior decisions in *Sears* and in *Wortham v. State,* 519 P.2d 797 (Alaska 1974), evincing a recognition that a parolee is not to be treated as an ordinary citizen who has never committed a crime. In *Wortham,* we considered the sufficiency of an extradition warrant for a parole violator. We rejected Wortham's contention that persons subjected to extradition proceedings are protected with the same degree of constitutional protection as ordinary citizens and stated that the:

> probable cause requirements for rendering up an alleged parole violator are, in our opinion, less stringent than the requirements for extraditing one who has only been charged with and not convicted of a crime.

board or member as justification for issuance of the warrant.[21]

## III. VALIDITY OF THE SEARCH

### A. Was the Warrant Issued as a Pretext for Gathering Evidence:

■ Where the administrative action is merely a cover for illegal police activity, otherwise permissible administrative searches and seizures may be held invalid. In *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Supreme Court responded to allegations that the Immigration and Naturalization Service warrant for petitioner's arrest was motivated and issued in bad faith as a subterfuge for improper F.B.I. activity. It noted that:

The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the court. The preliminary stages of a criminal prosecution must be pursued in strict obedience to safeguards and restrictions of the constitution and laws of the United States. A finding of bad faith is, however, not open to us on this record. *Id.* at 226, 80 S.Ct. at 690, 4 L.Ed.2d at 678.

These constitutional limits on police involvement in administrative searches and seizures have been recognized by lower federal and state courts as well,[22] and in part provide the basis for distinguishing the constitutionality of searches and seizures by parole officers acting in an administrative

capacity from those in which the parole officer acts at the instigation of the police for the purpose of assisting in a criminal prosecution.[23] A parole officer, however, may act for legitimate parole-connected purposes on information furnished by the police.

■ Here, the evidence presented at trial regarding the police role in issuance of the warrant was conflicting. There was some testimony that Officer Davis' involvement in urging Smith to issue the warrant was somewhat unusual in Davenport's case, one of the thirty-five burglaries Davis was investigating. In support of the finding below, however, is Smith's testimony that he did not act on the information provided by Davis and Clemens because he lacked proof of the truth of their allegations. It could reasonably be found that his ultimate decision to seek a warrant was based on his independent conclusion that the conditions of Davenport's parole were violated. There were grounds for the warrant completely unrelated to the activity in which the police were interested. These grounds include Davenport's failure to report to his parole officer and his misrepresentations regarding his employment. It should be noted that Officer Davis' surprise at finding stolen goods inside the apartment is also indicative of the fact that the warrant was not a pretext.

We hold that the trial court's findings that the evidence of probation violations supported the entry are not clearly erroneous.

**21.** We place this gloss on the statute in the absence of any applicable regulations having been issued by the Parole Board.

AS 33.15.200 specifies that "A warrant for the retaking of a state prisoner who violates his parole may be issued only by the board or a member of it . . . ." The section does not state any requirements for the issuance of the warrant. It does not even refer to the necessity of probable cause being shown. There is no more indication that the legislature wanted the warrant to be issued on an oral statement of the parole officer than on a written statement or affidavit. The requirements for issuance of a warrant have been placed in issue by this appeal. Since all members of the Court agree that probable cause is required, it is necessary to state how such probable cause shall be established. Unless written evidence is sub-

mitted, unnecessary trials and appeals will occur. In the absence of any regulations or statutory specifications, a decision as to applicable requirements has to be made by the Court in order to furnish adequate guidance.

**22.** *See also United States v. Hallman,* 365 F.2d 289 (3rd Cir. 1966); *United States ex rel. Randazzo v. Follette, supra.*

**23.** *See Abel v. United States, supra.* Petitioner contended that the government's true purpose in obtaining the warrant was to place him in custody so that pressure might be brought to bear upon him as well as permit a search. The court suggested that either purpose, if factually supported, would have been constitutionally impermissible.

B. Probable Cause to Enter the Apartment:

 A police officer may not enter a dwelling in search of a suspect for whom he has an arrest warrant unless, at a minimum, he has probable cause to believe the suspect is within.[24] Davenport contends that the police lacked probable cause to enter and search Lillian White's apartment and that, therefore, any fruits of that search cannot be used as the basis for a subsequent warrant.[25] There is no contention that the search was broader than required to discover persons.

The information available to the police at the time of the entry and search included the following:

(1) Statements by the informant regarding Davenport's activities;

(2) Statements by Ms. Smith indicating that Davenport had been at the apartment earlier in the day and several times in the past. Ms. Smith had observed him earlier when music had been playing, and music was heard coming from Ms. White's apartment when the police arrived;

(3) Statements by Ms. Holding indicating that Davenport and Ms. White had left the apartment together the previous afternoon; and

(4) The car which Davenport allegedly had been using was not at his father's address.

On the basis of the above facts, the state argues that there was probable cause for believing that Davenport was in Ms. White's apartment.

 Although the reliability of the informant had not been established in the past,[26] his tip was independently corroborated by information from two "citizen informants," persons whose credibility may be considered less questionable than that of an unnamed and possibly criminal police contact.[27]

Both Ms. Smith and Ms. Holding's statements indicate that Davenport had been spending some time at the apartment, par-

24. *United States v. James,* 528 F.2d 999 (5th Cir. 1976); *Rice v. Wolff,* 513 F.2d 1280, 1291–95, *reh. denied,* (8th Cir. 1975), *rev'd on other grounds sub nom., Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 928 (3rd Cir. 1974); *United States v. Phillips,* 497 F.2d 1131, 1136, *reh. denied,* (9th Cir. 1974); *Fisher v. Volz,* 496 F.2d 333, 341 (3rd Cir. 1974); *United States v. Shye,* 492 F.2d 886 (6th Cir. 1974); *United States v. Brown,* 151 U.S.App.D.C. 365, 467 F.2d 419, 423 (1972); *United States v. McKinney,* 379 F.2d 259, 262–63 (6th Cir. 1967).

Davenport does not contend that a search warrant was required for this initial entry even though this court has indicated that, subject to certain limited exceptions, a warrantless search is *per se* invalid. *See, e. g., Keller v. State,* 543 P.2d 1211, 1220 (Alaska 1975). Professor Amsterdam has noted that the:

arrest—entry doctrine [requiring only probable cause to enter and search pursuant to an arrest warrant] is currently undergoing reconsideration and will probably survive only in hot pursuit situations.

Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 360 (1974). The United States Supreme Court has not addressed this question, and the circuit courts are split. *See Rice v. Wolff, supra,* at 1292 n.7. Since the issue has not been raised here, we do not pass upon it.

25. The exclusionary rule extends to the indirect as well as the direct products of unconstitutional police misconduct. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441, 455 (1963); *Erickson v. State,* 507 P.2d 508, 516 (Alaska 1973). Nothing in the record suggests that the evidence might have been discovered through means independent of the initial entry and search of Ms. White's apartment.

26. Where probable cause is based solely on the tip of an informant, this court has required a showing of personal knowledge and credibility or reliability. *Keller v. State,* 543 P.2d 1211, 1216–19 (Alaska 1975); *Harrelson v. State,* 516 P.2d 390, 394–96 (Alaska 1973); *State v. Davenport,* 510 P.2d 78, 81–83 (Alaska 1973); *Davis v. State,* 499 P.2d 1025, 1029 (Alaska 1972), *rev'd on other grounds,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). *See Erickson v. State,* 507 P.2d 508, 517–19 (Alaska 1973). These decisions are based on those of the United States Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 112, 84 S.Ct. 1509, 12 L.Ed.2d 723, 727 (1964), and *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637, 644 (1969).

27. *See Erickson, supra.*

ticularly in the last couple of days. These facts would tend to support the inference that Davenport was living there. Ms. Smith's information regarding Davenport's whereabouts at the time of the entry was approximately four hours old. However, the facts that she had heard music playing earlier in the morning and that music could be heard when the police arrived could reasonably indicate that Davenport had remained in the apartment since 10:00 a. m. The state argues that the passage of time between Ms. Smith's initial observations and the entry did not negate the existence of probable cause.

Passage of time was not apparently considered a significant factor in *United States v. McKinney,* 379 F.2d 259 (6th Cir. 1967).[28] There the police relied on a month-old tip by an acquaintance of the suspect that McKinney had "spent some time in or around" the apartment of a third person, as well as a tip from a source of undisclosed reliability, about noon on the day of the entry, that the suspect was then in the apartment. Considering all the circumstances, the court upheld the entry which was made "later in the afternoon." Probable cause has been found in a number of other federal cases which involve facts similar to those at hand.[29]

Considering the totality of the circumstances, we hold that the trial court's finding of probable cause was not erroneous.

## IV. SENTENCE APPEAL

██ The state has cross-appealed, contending that the eighteen-month concurrent sentence imposed by Judge Kalamarides and the subsequent five-year concurrent sentence imposed by Judge Carlson were too lenient.

Davenport's felony record is accurately summarized in the state's brief as follows:

> The instant offense represented Davenport's fifth felony conviction. He had previously been convicted and sentenced to 18 months for burglary in a dwelling in 1969. In 1972, Davenport had been convicted of a previous offense of receiving and concealing stolen property and at the same time had been convicted of both assault with a dangerous weapon and felon in possession. He then received a three-year sentence on the receiving and concealing charge, a six-year sentence for ADW, and a five-year sentence for being a felon in possession. Davenport was on parole from these sentences at the time of the instant offense. He had previously been placed on parole and had been returned to custody for a parole violation.

Subsequent to the filing of the state's brief, we decided *State v. Carlson,* 560 P.2d 26 (Alaska 1977), an appeal from Davenport's conviction as an habitual criminal. We vacated the five-year sentence imposed on Davenport by Judge Carlson and reinstated the original eighteen-month sentence on the ground that Davenport was improperly indicted under the habitual criminal statute. We held that he could not be resentenced under AS 12.55.050(2) to more

**28.** The state also cites *United States v. Brown,* 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). In that case, the court noted that the six-hour wait did diminish the likelihood that Brown was still in the apartment, but not to such an extent as to negate the existence of probable cause. Implicit in the opinion and the determination of reasonableness, however, was the notion of "exigent circumstances" which distinguishes *Brown* from the instant case.

**29.** *See Government of Virgin Islands v. Gereau, supra* (probable cause found on tip from credible informant, fact that suspects had no known or knowable address and view of one suspect exiting from building); *Rodriguez v. Jones,* 473 F.2d 599 (5th Cir. 1973) (tip from reliable informant who had seen suspects on same evening and informed police that suspects had made death threats against them justified arrest warrant search of suspect's home two and one-half hours after information received). *Fisher v. Volz, supra* (police searched the apartment of a third person, but did so on the belief, based in part on information provided by the telephone company, that it was the suspect's home). *But cf. Rice v. Wolff,* 513 F.2d 1280, (8th Cir. 1975), *rev'd on other grounds sub nom., Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, *reh. denied,* 429 U.S. 874, 97 S.Ct. 197, 50 L.Ed.2d 158, (1976) (no probable cause where only reason to believe suspect in home of third person was that both were in same black political association).

than the eighteen-month sentence originally imposed without placing him twice in jeopardy. In view of our decision in that case, it is unnecessary to pass on the state's contention that the sentence imposed by Judge Carlson was too lenient.

We agree with the state that the eighteen-month concurrent sentence imposed by Judge Kalamarides was too lenient. At twenty-six years of age, Davenport has a significant criminal record.[30] The instant offense was committed while he was released on parole. The over-all effect of imposing a sentence of eighteen months to run concurrently with his prior sentences is to give little significance to the fact that a felony was committed while Davenport was on parole from a prior offense. At the least, some of the sentence should have been imposed to run consecutively to his other sentences.[31] The trial court's primary emphasis was a justifiable concern with Davenport's rehabilitation. In view of his past record, Davenport could have been classified as among the "worst type of offenders." [32] We do not believe that the sentence adequately serves as a deterrent to Davenport and others. Protection of society appears to require Davenport's isolation. A reaffirmation of societal norms would seem to indicate that, in this case, Davenport should have been required to serve some time in prison over and above the period he was required to serve for unrelated offenses.[33] Under these circumstances, we conclude that the trial judge was clearly mistaken in imposing a concurrent sentence.

The judgment of the superior court is affirmed, although the sentence imposed is, in our opinion, too lenient.

AFFIRMED.

RABINOWITZ, J., dissents in part.

BURKE, J., dissents separately in part.

ERWIN, J., not participating.

RABINOWITZ, Justice, dissenting in part.

I am in agreement with the court's construction of AS 33.15.200 which requires that absent exigent circumstances a parole officer must secure a warrant from the Parole Board or Board member, that the warrant can issue only on probable cause, and that there must be a written statement indicating probable cause which is to be filed with the Parole Board or Board member. My disagreement with the majority's non-constitutional construction of AS 33.-15.200 is that I find no persuasive policy reasons for not requiring the Parole Officer's written statement of probable cause to be made under oath.

BURKE, Justice, dissenting in part.

To the extent that the majority opinion requires the filing of a "written statement indicating probable cause . . . as justification for issuance of the warrant" in future cases, I dissent. To impose such a requirement is to amend the statute, and unless it can be said that a written statement of probable cause is a requirement of due process of law, which the majority concedes it is not, I fail to discern any legitimate basis for such action by this court. Simply because the statute is silent on whether the constitutional requirement of probable cause is to be shown by one method as opposed to the other, hardly leads to the conclusion that this court is empowered to *require the use of either one of them.* Despite the existence of what we may believe to be needed improvements in the law, our authority is not without its limitations.

30. In addition to his felony convictions, Davenport was incarcerated twice as a juvenile and has numerous misdemeanor offenses including speeding, reckless driving, indecent language, failure to appear and resisting arrest.

31. *See State v. Wortham,* 537 P.2d 1117 (Alaska 1974).

32. *Id.* at 1120. *But see Galaktionoff v. State,* 486 P.2d 919, 924 (Alaska 1971).

33. *See State v. Chaney,* 477 P.2d 441 (Alaska 1970).