Robert L. ROMAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 2856.

Supreme Court of Alaska.

Nov. 10, 1977.

Rita T. Allee, Jermain, Horton & Bittner, Fairbanks, for appellant.

Timothy J. Petumenos, Asst. Dist. Atty., and Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Chief Justice.

■ In this appeal, we are asked to decide the nature and extent of rights afforded a parolee under the provisions of the fourth amendment to the United States Constitution[1] and the parallel provision of the Alaska Constitution[2] which prohibit unreasonable searches and seizures. In this matter of first impression in Alaska, we hold that, except in circumstances where reasonably conducted searches and seizures are required by the legitimate demands of correctional authorities and are set forth as conditions of parole by the Parole Board, the Alaska Constitution entitles a released offender[3] to the same protections as an ordinary person.

On November 7, 1975, Robert Roman, on parole for possession of heroin, appeared at a parole revocation hearing initiated by his parole officer, Ronald Murray. The Parole Board continued Mr. Roman on parole status. As a result of the proceeding, however, Mr. Murray drafted a list of supplemental conditions of parole. Among the supplemental conditions was the following:

> 2. Submit your person, vehicle and dwelling to search for contraband on demand by any parole officer or peace officer.

Murray and Roman had initially determined that the supplemental conditions would be signed on November 10; but due to scheduling difficulties, it was agreed that the conditions would be sent to Roman at a work camp on the Trans-Alaska Pipeline for his signature.[4]

On November 11, 1975, Murray received information from Richard Wisenor, a federal narcotics agent, that Roman had used heroin on the previous evening.[5] Accompa-

1. The fourth amendment to the United States Constitution states:

> Searches and seizures. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

2. Art. I, sec. 14 of the Alaska Constitution provides:

> Searches and seizures. The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describ-

ing the place to be searched, and the persons or things to be seized.

3. The state here suggests that we should distinguish between probationers and parolees based on the fact that the former are not initially subject to imprisonment. They point out no cases making such a distinction as far as search and seizure questions are concerned, and we see no valid reason to further complicate the law by making one here.

4. While on parole, Roman had been granted permission to work and was employed in construction of the Pipeline.

5. Wisenor had also indicated that an area-wide narcotics team was preparing to effect a "buy" from Roman, but Murray subsequently learned that the "buy" had fallen through.

nied by Allen, of the Division of Corrections, Murray proceeded to the Fairbanks International Airport for the purpose of obtaining a urine sample from Roman prior to his departure to his work camp on the pipeline. Authority to obtain a urine specimen was set forth as an original condition of Roman's parole. Murray also sought to secure Roman's signature to the supplemental conditions of parole personally in the presence of witnesses and, in view of the information concerning Roman's use of heroin, considered conducting a search of the person.

At the airport, Murray and Allen were joined by an airport security officer whom they had contacted and provided information concerning the purpose of their trip. The three men followed Roman to the men's room where Roman, upon request, signed the supplemental conditions of parole. Roman was asked to provide a urine sample, but he indicated that he was physically unable to do so.

Shortly thereafter, the group proceeded to the check-in desk so that Roman would be able to board his plane. They were there joined by Agent Wisenor and by Mr. Roman's father. It was then determined that it was too late for Roman to board his flight; and Murray decided that, in view of the circumstances, he would conduct a search of Roman's person and belongings. His grounds for the search were: (1) the tip to agent Wisenor by an unidentified informant that Roman had recently used heroin; (2) the fact that Roman had been unwilling or unable to provide a urine sample and (3) the fact that Roman was departing for a remote location and, if using narcotics, would be likely to have them with him.

The search of Roman's person was initiated at the customs area of the airport by Murray. Allen, Wisenor and the airport security officer were also present; but Murray had not requested either Wisenor or the security officer to accompany him. Initially, Roman cooperated with the search by emptying the pockets of his parka on the table. Later, when Murray noticed a clear packet containing a white substance in Roman's belt area, Roman attempted to resist. Ultimately, the packet was seized and was found to contain heroin.

At trial for possession of narcotic drugs (AS 17.10.010), Roman moved to suppress the heroin and other items subsequently seized from his person and luggage. The trial court concluded that a warrantless search of a parolee is not unconstitutional if the parole officer has reasonable grounds to believe that a parole violation is presently occurring. It found adequate grounds to support the search in this case and, accordingly, denied Roman's motion. Roman was found guilty as charged in the indictment and was sentenced to ten years with five years suspended. We affirm.

On appeal, Mr. Roman raises two issues. First, he contends that parolees have the same protections against unreasonable searches and seizures as ordinary persons and that the illegally-seized evidence should have been suppressed. Second, challenging his sentence, he claims that the sentence for the crime of illegal possession of narcotics for personal use by a narcotics addict must include an option for treatment of addiction.

## SEARCH AND SEIZURE

As we have noted in *Davenport v. State,* 568 P.2d 939, Opn. No. 1479 (Alaska, 1977), the United States Supreme Court decision in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), introduced a new judicial concept regarding the constitutional status of parolees and probationers. Prior to that decision, the prevailing view derived from a theory of "constructive custody." Under this theory, the released offender was regarded as constitutionally entitled to no more rights than he would have enjoyed if incarcerated.[6] While the Court

---

6. *See, e. g., People v. Hernandez,* 229 Cal. App.2d 143, 40 Cal.Rptr. 100 (Cal.App.1964), *cert. denied,* 381 U.S. 953, 85 S.Ct. 1810, 14

L.Ed.2d 725 (1965); *United States ex rel. Randazzo v. Follette,* 282 F.Supp. 10 (S.D.N.Y. 1968), *aff'd,* 418 F.2d 1319 (2d Cir. 1969), *cert.*

in *Morrissey* did not extend the "full panoply of rights" under the fourteenth amendment to the parolee or probationer, it did recognize that:

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. 408 U.S. at 482, 92 S.Ct. at 2600, 33 L.Ed.2d at 494–95. (footnotes omitted)

Thus, the Court implicitly rejected the custody rationale.[7]

For the most part, the decisions of this court regarding the rights of released offenders have utilized the approach of the Supreme Court and balanced the "precise nature of the governmental interest involved" against the "private interest that has been effected by governmental

action."[8] In *Bush v. Reid,* 516 P.2d 1215 (Alaska 1973), we held that a parolee was entitled to bring a civil suit in the Alaska courts. We began our analysis with the proposition that:

> Any suggestion that a parolee was deprived by his custodial status of standing to assert a denial of due process was dissolved by the United States Supreme Court in *Morrissey v. Brewer.* 516 P.2d at 1217.

Finding a due process deprivation, we cited *Morrissey* and reasoned:

> The finding of a deprivation of a property right does not conclude a due process analysis; the assessment of what process is due requires a balancing of the individual's interest against the state's justification for its enactment. Denial of incarcerated felons' access to the civil judicial process has been justified by fears of disruption of prison routine, spurious litigation commenced in the hope of spending a few hours beyond the bars of prison and increased risks of escape by prisoners en route to hearings. Where the litigant is a parolee, to state these arguments is to reveal their absurdity. . . . 516 P.2d at 1220. (footnotes omitted)

Subsequently, in *State v. Sears,* 553 P.2d 907 (Alaska 1976), we were confronted with the question of whether the federal exclusionary rule and our similar Criminal Rule 26(g) precluded the use of illegally-obtained evidence in a parole or probation revocation hearing. Our conclusion that ordinarily [9]

---

*denied,* 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1970); *Rose v. Haskins,* 388 F.2d 91 (6th Cir.), *cert. denied,* 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968). *See generally,* Note, Extending Search-and-Seizure Protection to Parolees in California, 22 Stan.L.Rev. 129 (1969); Note, Search and Seizure Rights of Parolees and Probationers in the Ninth Circuit, 44 Ford. L.Rev. 617 (1975); Note, Fourth Amendment Limitations on Probation and Parole Supervision, 1976 Duke L.J. 71 (1976).

**7.** *See* The Supreme Court, 1971 Term, 86 Harv. L.Rev. 1, 96 n. 7 (1972).

**8.** *Morrissey, supra* at 481, 92 S.Ct. 2593, *quoting, Cafeteria & Restaurant Workers Union v.*

*McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230, 1236 (1961).

**9.** We did note in *Sears* that application of the exclusionary rule to probation revocation proceedings might be appropriate in the event of "police misconduct which shocks the conscience." Similarly, we stated that the exclusionary rule would be applied where the lawless arrest and search and seizure were carried out by enforcement personnel with knowledge or reason to believe the suspect was a probationer. *Sears, supra* at 914. The same rules would apply in cases of parole.

both rules were inapplicable to such a proceeding was based, in part, on the rationale that the governmental interests involved outweighed any marginal deterrent effects which would flow from application of the exclusionary rule. Quoting *United States v. Winsett,* 518 F.2d 51, 54–55 (9th Cir. 1975), we stated:

> As articulated by the Ninth Circuit, the primary purpose of probation is ". . . to promote the rehabilitation of the criminal by allowing him to integrate into society as a constructive individual, without being confined for the term of the sentence imposed. Cf. *Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). . . . Because violation of probation conditions may indicate that the probationer is not ready or is incapable of rehabilitation by integration into society, it is extremely important that *all reliable* evidence shedding light on the probationer's conduct be available during probation revocation proceedings." (footnote omitted) (emphasis in original) 553 P.2d at 912–13.

The *Sears* opinion recognized that the federal and state exclusionary rules would bar the use of illegally-obtained evidence in a new criminal proceeding as contrasted with a parole or probation revocation hearing. Since the illegality of the seizure was not there contested, the question of the scope of protection against unreasonable searches and seizures accorded the released offender was left open.

In our most recent opinion dealing with the rights of released offenders, *Davenport v. State, supra,* we considered the constitutional requirements for the arrest of a parolee and commented on the decisions from other state and federal courts. Although we held that the absence of sworn affida-vits or a written complaint did not render an arrest warrant for parole violation constitutionally invalid, we concluded that such warrants could issue only upon probable cause to believe that a violation had occurred. *Davenport, supra.*

■ Following the rationale of *Morrissey* and our prior decisions, we begin assessing Mr. Roman's claim by analyzing the status of the released offender and his legitimate expectation of freedom from governmental interference. While we examine decisions of the United States Supreme Court to determine what is mandated upon the states by the federal constitution, this does not complete our analysis. We have stated many times that we may construe the Alaska Constitution to afford broader rights than similar federal provisions.[10] Although decisions of lower federal courts and of state courts are not dispositive in such construction, we may look to them for guidance.

■ Any justification for treating parolees differently from any other person must stem from their special status. They are entitled to all rights accorded other persons except where valid purposes of parole require restrictions. Clearly, parole authorities have a special interest in the otherwise private affairs of the parolee. Most courts[11] and commentators[12] and some legislatures,[13] however, have recognized that parole conditions must be reasonably related to the rehabilitation of the offender and the protection of the public and must not be unduly restrictive of liberty.

The post-*Morrissey* rejection of the custody theory and the need for careful judicial scrutiny of parole and probation conditions has been expressed most clearly in the lead-

---

10. *See Davenport, supra* at Page 947 n. 19; *Blue v. State,* 558 P.2d 636, 641 n. 7 (Alaska 1977), and cases cited therein; *Baker v. City of Fairbanks,* 471 P.2d 386 (Alaska 1970).

11. *See, e. g., Tamez v. State,* 534 S.W.2d 686 (Tex.Cr.App.1976); *United States v. Consuelo-Gonzalez,* 521 F.2d 259 (9th Cir. 1975); *Porth v. Templar,* 453 F.2d 330 (10th Cir. 1971).

12. *See* ABA Project on Standards for Criminal Justice, Standards Relating to Probation § 3.2(b) (Approved draft, 1970); ALI Model Penal Code § 301.1(2)(1) (Proposed Official draft, 1962).

13. *See* Note, Fourth Amendment Limitations on Probation and Parole Supervision, 1976 Duke L.J. 71, 92 n. 120.

ing case of *United States v. Consuelo-Gonzalez,* 521 F.2d 259, 265 (9th Cir. 1975):

> While it must be recognized that probationers, like parolees and prisoners, properly are subject to limitations from which ordinary persons are free, it is also true that these limitations in the aggregate must serve the ends of probation. Conditions that unquestionably restrict otherwise inviolable constitutional rights may properly be subject to special scrutiny to determine whether the limitation does in fact serve the dual objectives of rehabilitation and public safety. But this is not to say that there is any presumption, however weak, that such limitations are impermissible. Rather, it is necessary to recognize that when fundamental rights are curbed it must be done sensitively and with a keen appreciation that the infringement must serve the broad purposes of the [Federal] Probation Act. This burden cannot be avoided by asserting either that the probationer has voluntarily waived his rights by not objecting in a proper manner to the conditions imposed upon him or that he must accept any condition the court "deems best" as a consequence of being "in custody." (footnotes omitted)

In Consuelo-Gonzalez, the Ninth Circuit found that a condition of probation which required the probationer to submit to searches by any law enforcement officer was outside the scope of trial court discretion under the Federal Probation Act[14] and found a search conducted pursuant to such a condition to be illegal.[15] Noting, however, that searches may constitute an effective supervisory technique, the plurality suggested that searches conducted in a reasonable manner and at reasonable times would be permissible under the Act.[16]

Other courts, in decisions both prior and subsequent to *Consuelo-Gonzalez,* have held that, under the standards of *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973),[17] a released offender has not voluntarily consented to all conditions of parole or probation; and the courts have invalidated overbroad conditions.[18] Our

---

14. 18 U.S.C. § 3651.

15. *Cf. United States v. Gordon,* 540 F.2d 452 (9th Cir. 1976), where the court affirmed the validity of a search made pursuant to a condition of probation identical to that at issue in *Consuelo-Gonzalez.* It reasoned that *Consuelo-Gonzalez* established the proper language for future probation orders but did not invalidate prior, broader orders which could be narrowly and properly exercised.

16. The court's decision was grounded, in part, on its construction of the Federal Probation Act, and it expressly refrained from deciding the extent to which the states constitutionally might impose conditions more intrusive on the probationer's privacy than those it indicated were proper under the Act. 521 F.2d at 266. Nevertheless, the "reasonableness" language seems to be derived from the companion case to *Consuelo-Gonzalez, Latta v. Fitzharris,* 521 F.2d 246 (9th Cir. 1975), *cert. denied,* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1976), in which the court held that both the probable cause standard and the warrant requirements were inapplicable to searches and seizures of a parolee. It concluded that the parolee and his home were subject to search whenever the correctional officer reasonably believes that such a search is necessary. The decision to search is valid even if based on the "hunch" of the officer. Searches by correctional officers have also been upheld on the basis of "reasonable grounds to believe that a parole violation has occurred," *People v. Anderson,* 536 P.2d 302, 385 (Colo.1975); "reasonable cause," *Himmage v. State,* 88 Nev. 296, 496 P.2d 763, 764–65 (1972); and "well-founded suspicion," *State v. Simms,* 10 Wash.App. 75, 516 P.2d 1088, 1096 (1973); *see also, State v. Montgomery,* 566 P.2d 1329 (Ariz.1977).

17. *Bumper, supra,* held that to substantiate consent to a search, the state must show that such consent has been freely and voluntarily given. In determining whether this burden has been met, *Schneckloth* requires an examination of the totality of facts and circumstances involved.

18. *See Tamez v. State,* 534 S.W.2d 686 (Tex.Cr. App.1976) (condition permitting warrantless search and seizure at any time of day or night held overbroad); *Porth v. Templar,* 453 F.2d 330 (10th Cir. 1971) (conditions of probation prohibiting expression of opinion on constitutionality of tax laws which probationer has been found guilty of violating held overbroad). *But cf., People v. Mason,* 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630 (Cal.1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1289, 31 L.Ed.2d

agreement with these holdings disposes of the state's argument here that the search was valid because of Roman's consent by signing the supplemental conditions of parole.

Although we do not believe that a released offender has voluntarily consented to all conditions of parole and we likewise reject the the custody rationale, we do recognize that conditioning release on some forms of search by correctional authority is both consistent with the goal of rehabilitation and necessary for the proper functioning of the parole system. To this extent, parolees have a diminished expectation of privacy. Depending on the nature of the crime involved, a condition of release granting authorities the right to search premises and persons at reasonable times[19] could stand muster under both the Alaska and federal Constitutions. Released offenders

subject to searches and seizures conducted pursuant to such conditions would be protected from undue harassment by the limitations of due process.[20]

Such conditions might be permissible in the case of one convicted of sale of narcotic drugs or of concealing stolen property, to ensure that such activities were no longer continuing.[21] On the other hand, one who had been convicted of a felony such as manslaughter as a result of recklessly driving an automobile should not be subjected to searches and seizures because of his status as a parolee. The goals of rehabilitation of the individual and protection of the public do not require that such a parolee be subject to searches in a manner different from other persons.

We start with the premise that warrantless searches of parolees or proba-

---

478 (1972) (condition permitting warrantless search by probation officer at any time is reasonable where original conviction was for narcotics offense).

**19.** By reference to searches at reasonable times, we do not prohibit unscheduled searches as long as they do not constitute harassment.

**20.** We emphasize, however, that even where such conditions are otherwise appropriate, they authorize searches only by correctional authorities or peace officers acting under their direction. As we noted in *Davenport, supra,* the rights of released offenders in relations with supervising personnel have long been distinguished from their rights with regard to police officers, even under the custody rationale. *See People v. Hernandez,* 229 Cal.App.2d 143, 40 Cal.Rptr. 100 (Cal.App.1964), *cert. denied,* 381 U.S. 953, 85 S.Ct. 1810, 14 L.Ed.2d 725 (1965). *Cf. United States v. Hallman,* 365 F.2d 289, 292 (3d Cir. 1966). It is only the dual mandate of correctional officers to rehabilitate their clients and to protect society that justifies an intrusion into the privacy of the released offender. Therefore, the broad permission to search imposed as a condition of Roman's parole, to the extent that it would permit searches by peace officers other than at the direction of parole authorities, is invalid.

**21.** One commentator has suggested that applicable regulations might specify the crimes for which a "submission to search" condition could be imposed and enumerate those character traits which indicate whether a particular offender will require careful surveillance, stating: "persons who have been convicted of

crimes which do not involve contraband substances, stolen property, or dangerous weapons should seldom, if ever, be subject to searches as a condition of probation." Note, Fourth Amendment Limitations on Probation and Parole Supervision, 1976 Duke L.J. 71, 92. To the extent that such regulations limit a released offender's reasonable expectation of privacy, a search pursuant to a condition of release bears some resemblances to an administrative search which may be conducted without a warrant. *See United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), which held that a warrant was not required for administrative searches of certain regulated businesses. In general, however, we do not think that the administrative search rationale is applicable to searches and seizures of parolees and probationers. Unlike the situation in *Biswell* and *Colonnade* and that in the related cases of *Camara v. Municipal Court,* 387 U.S. 523, 18 L.Ed.2d 930 (1967), and *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), there is no statutory or regulatory authority for general searches and seizures of parolees and probationers. For a well-reasoned discussion of the applicability of the administrative search rationale in the context of parole and probation, see the dissent of Judge Hufstedler in *Latta v. Fitzharris, supra* at 254. We have discussed these cases in a more appropriate setting in our decision in *Woods & Rohde, Inc. v. State,* 565 P.2d 138 (Alaska 1977).

tioners and their residences should not be countenanced unless there is a direct relationship of the searches to the nature of the crime for which the parolee was convicted. The reasons for applying search and seizure protections to parolees whenever consistent with the reasonable requirements of parole are well stated in a New York University Law Review note:[22]

> Fourth amendment protection will be diminished not only for parolees, but also for the family and friends with whom the parolee might be living. Those bystanders may find themselves subject to warrantless searches only because they are good enough to shelter the parolee, and they may therefore be less willing to help him—a sadly ironic result in a system designed to encourage reintegraton into society. Moreover, the demeaning effect of arbitrary intrusions into the parolee's privacy will be reflected in the attitudes of his relatives and friends. As a result, the parolee will suffer diminished feelings of self-worth, making his rehabilitation more difficult. In addition, warrantless parole officer searches may reinforce patterns of resentment to authority, and excessive external controls may inhibit the development of necessary internal controls: "a person must have the freedom to be responsible if he is to become responsibly free." (footnotes omitted)

■ Parole officers, of course, are empowered to interview their charges and to visit them at their residences. If contraband is discovered during such a visit, and not the result of a search, it would fall within the plain view exception to the search warrant requirement.[23]

AS 33.15.100 authorizes the Parole Board to ". . . adopt rules which it considers necessary or proper with respect to . . . conditions of release to be imposed on parolees." The Board is best able to prescribe specific rules to govern situations where searches are permissible, and the times and manner of conducting such searches under the broad outlines we have set forth. We urge the Board to adopt such rules.[24]

■ Without the benefit of such rules, we now must determine the validity of the search of Mr. Roman's person. Roman was convicted of possession of heroin. The right to request specimens for urinalysis and to search him and his quarters at reasonable times and in a reasonable manner[25] to assure that he would not continue to possess illegal drugs is necessary to the proper functioning of the parole system. The right to perform such searches is limited to parole officers and peace officers acting under their direction. It would appear that all of these conditions were met in the search of Mr. Roman; therefore, we cannot find that the parole authorities were clearly mistaken in authorizing the search and in conducting it under these circumstances. Roman's inability to furnish a specimen for urinalysis prevented use of that means of ascertaining whether he was using drugs; and, in view of his imminent departure, it was reasonable to search his person at that time.[26]

■ In the future, we believe that conditions of parole authorizing searches should be specified by the Parole Board and not left to the discretion of individual pa-

---

**22.** Note, Striking the Balance Between Privacy and Supervision: The Fourth Amendment and Parole and Probation Officer Searches of Parolees and Probationers, 51 N.Y.U.L.Rev. 800, 816 (1976).

**23.** See, e. g., Daygee v. State, 514 P.2d 1159, 1162 (Alaska 1973).

**24.** See 51 N.Y.U.L.Rev. at 817–23 and Note 20, supra.

**25.** For example, a search of one convicted of assault with a dangerous weapon (pistol)

would not extend to examination of the contents of his wallet, since it would be unreasonable to expect to find such dangerous weapons there.

**26.** As we have indicated, the authorization for searches was too broad in subjecting Roman to searches other than by or at the direction of parole officers. Since the search here was under Parole Officer Murray's direction, however, it was not within that invalid condition.

role officers.[27] This procedure will afford parolees some of the protections accorded others before issuance of search warrants, without burdening parole authorities with the requirement of securing warrants for each search. The Parole Board can serve as a more detached arbiter of the reasonableness of the search conditions prior to their imposition than can an individual parole officer. Variances of conditions among parolees similarly situated should also be minimized by this method. The Board could impose such conditions on parole without the probable cause necessary for issuance of a search warrant; however, a reasonable nexus between the parolee's underlying offense and the condition is required.

 The parolee should have the right to be heard [28] before such conditions are imposed.[29] Here, prior to Parole Officer Murray's imposition of the search conditions, Roman was granted a general hearing; and he agreed to signing the new conditions. Since we have found that the conditions themselves were reasonable as applied, we shall apply the procedural requirements set forth in this opinion prospectively only.[30] We consider the requirement that the Parole Board authorize searches to be procedural in nature. It is grounded in our supervisory powers over state courts pertaining to the admissibility of evidence. That rationale was not suggested by Roman

on this appeal. We therefore do not find this to be an occasion where the appellant should be given the benefit of the new requirement.[31]

Accordingly, we hold that the trial court did not err in denying the motion to suppress the evidence.

## SENTENCE

Roman contends that his sentence was excessive and improper in that it failed to provide for professional treatment of his drug addiction. The sentence of ten years imprisonment with five suspended did contain a recommendation that the defendant receive drug therapy treatment during incarceration.

Apparently, Roman does not contend that such treatment will be unavailable; [32] rather, he argues that he must be given an option of drug treatment in lieu of incarceration. He cites no authority for this proposition, although tangential reference is made to *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). There, the United States Supreme Court held that narcotic addiction is an illness and that:

> a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any

---

27. Similarly, the sentencing judge will impose the conditions on probationers and will rule on any proposed changes. *See* AS 12.55.090 and AS 12.55.100.

28. The hearing at which parole is considered could serve this purpose.

29. Our holding is not as sweeping as that apparently suggested by the Iowa Supreme Court in *State v. Cullison*, 173 N.W.2d 533, *cert. denied*, 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970), where the court held that released offenders are to be accorded full fourth amendment protections. *Cullison* involved a search and seizure which was not conducted pursuant to a condition of parole, and the court did not there consider whether there were any valid limits on a parolee's or probationer's expectation of privacy. We reject, however, those decisions (*see* Note 16) which have held that probable cause is unnecessary even where no condition of parole permitted the search or seizure. We find those decisions unpersuasive

in interpreting the provisions of our own constitution.

30. The requirements shall apply to all persons released on parole more than thirty days after the issuance of the mandate in this appeal.

31. *Cf. Davenport v. State*, 568 P.2d 939, Opn. No. 1479 (Alaska 1977), where we prospectively required written statements of parole officers to justify issuance of warrants for arrest.

32. *See Bresolin v. Morris*, 88 Wash.2d 167, 558 P.2d 1350 (Wash.1977), in which a majority of the court found no constitutional violation in the failure of a Washington correctional institution to provide a more extended drug rehabilitation program. The dissenting justices in an opinion of Justice Utter found an obligation on the part of the state to provide adequate treatment for addicts. 558 P.2d at 1358.

irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment.[33]

As counsel admits, however, *Robinson* carefully distinguished punishment for the status of addiction from punishment for the use, purchase, sale or possession of narcotics.[34] The Court quoted with approval from *Minnesota ex rel. Whipple v. Martinson*, 256 U.S. 41, 41 S.Ct. 425, 65 L.Ed. 819 (1921), as follows:

> There can be no question of the authority of the State in the exercise of its police power to regulate the administration, sale, prescription and use of dangerous and habit-forming drugs . . . . The right to exercise this power is so manifest in the interest of the public health and welfare, that it is unnecessary to enter upon a discussion of it beyond saying that it is too firmly established to be successfully called in question.[35]

 As long as the legislature acts within constitutional bounds, it is not our function to determine whether the state's response to the use of narcotic drugs is best suited to solving the societal problems created by the illness of addiction. We do commend to the legislature the perceptive comments of Messers. Cuskey and Krasner noted by Justice Dimond in *Huff v. State*, 568 P.2d 1014 (Alaska 1977), pertaining to the advantages of placing primary emphasis on the treatment of addiction.[36] We further note that the federal government has enacted legislation whereby eligible offenders who are addicts may be civilly committed for rehabilitative treatment in lieu of incarceration.[37]

 Our legislature has elected to impose severe penalties for possession of narcotic drugs. AS 17.10.200 provides for a term of from ten to twenty years for second offenders such as Roman. In view of his prior conviction for this offense and an earlier conviction of burglary not in a dwelling, we cannot say that the trial court was clearly mistaken[38] in imposing the ten-year sentence with five years suspended.

AFFIRMED.

---

**33.** 370 U.S. at 667, 82 S.Ct. at 1420, 8 L.Ed.2d at 763.

**34.** *Id.* at 762, 82 S.Ct. 1417.

**35.** *Id.* at 761–62, 82 S.Ct. 1417, 1419.

**36.** Cuskey & Krasner, "The Eyes of the Beholder: The Drug Addict as Criminal, Patient, or Victim," Contemporary Drug Problems, Vol. 2, 579 (1973). We also cannot but note that there is something self-defeating in forceably seizing drugs from a man who has been gainfully employed and is about to resume that employment despite his addiction and who apparently has just withstood efforts of federal officers to have him sell drugs. Instead of continuing his employment, he will now be a charge of the state.

**37.** Narcotic Addict Rehabilitation Act of 1966, 18 U.S.C. §§ 4251–4255 (1970, as amended). *See Marshall v. United States*, 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (rejecting due process and equal protection challenges to the Act). Alaska has a provision for custodial rehabilitative treatment of one convicted of possession or control of depressant, hallucinogenic and stimulant drugs, AS 17.12.120, but there is no similar provision pertaining to narcotic drugs.

**38.** *McLain v. State*, 519 P.2d 811 (Alaska 1974).