NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

CLAYTON ANDREW CHARLIE,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13962
Trial Court No. 3AN-18-10952 CR

O P I N I O N

No. 2793 — December 27, 2024

Appeal from the Superior Court, Third Judicial District, Anchorage, Andrew Peterson, Judge.

Appearances: Claire De Witte, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Appellant. Seneca Theno Freitag, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

Clayton Andrew Charlie, who has schizophrenia, repeatedly stabbed an Alaska Zoo employee and then ran him over with a car, killing him in a random attack. Charlie was initially found incompetent to stand trial, but was later restored to competency. Charlie then pleaded guilty to second-degree murder and was sentenced

to 75 years with 20 years suspended (55 years to serve) and 10 years' probation.[1] Among the probation conditions imposed was a condition requiring Charlie to take prescribed antipsychotic medication and providing for judicial review of that requirement if Charlie refused to take the medication.

Charlie now challenges the condition on various grounds that he failed to raise at sentencing. For the reasons explained here, we conclude that the condition is adequate and survives plain error review with one small modification to ensure that the State, and not Charlie, is responsible for scheduling the prerelease hearing.

*Factual background and prior proceedings*

Since June 2012, Charlie has been admitted to the Alaska Psychiatric Institute on thirteen separate occasions. Charlie's diagnoses include schizoaffective disorder and he has been prescribed several antipsychotic medications over the years to manage this condition. Charlie has a history of increasingly violent behavior, and he has accrued a significant history of police contacts, criminal convictions, and institutional violations.

In November 2018, Charlie randomly attacked Michael Greco, an employee of the Alaska Zoo, who was working as the night watchman. Greco's body was not discovered until the next morning. Greco had been stabbed multiple times in the chest, head, back, and legs. He had multiple rib fractures that perforated his lung, and had what appeared to be defensive injuries on his hands. Bloody tire marks in the snow indicated that Greco had also been run over by a vehicle and then dragged to the location where his body was found. Greco's wallet and cell phone were missing.

Charlie was apprehended in his stepfather's car, which had been reported stolen. Charlie initially refused to stop and engaged the police in a high-speed chase

---

[1]　AS 11.41.110(a)(2).

that only ended after two of his tires were deflated by a police device. Charlie was later determined to have used Greco's debit card, which was found in the stepfather's car.

Charlie was charged with one count of first-degree murder, two counts of second-degree murder, one count of first-degree burglary, one count of second-degree theft, one count of third-degree assault, one count of first-degree vehicle theft, one count of failure to stop at the direction of an officer, three counts of violation of a protective order, seven counts of fraudulent use of an access device, and one count of reckless driving.[2]

Charlie was initially found to be incompetent to stand trial because of his mental illness. But after he received restoration treatment in South Carolina, Charlie was found to be competent to stand trial.

Charlie pleaded guilty to second-degree murder pursuant to a plea agreement.[3] Under the terms of the agreement, Charlie agreed to admit the facts set forth in the complaint, receive a sentence with an active term of imprisonment between 35 and 55 years, and pay restitution. All other aspects of the sentence were left open, to be determined by the court.

A presentence report was submitted prior to sentencing. The probation officer recommended that the court impose Special Probation Condition No. 6. This condition, as initially worded by the probation officer, would require Charlie to "ingest, take or inject medications as prescribed by a licensed practitioner who has been

---

[2]   AS 11.41.100(a)(1)(A), AS 11.41.110(a)(1) and (a)(2), AS 11.46.300(a)(1), AS 11.46.130(a)(7), AS 11.41.220(a)(5), AS 11.46.360(a)(1), AS 28.35.182(a)(1), AS 11.56.740(a)(1), AS 11.46.285(b)(3), and AS 28.35.400, respectively.

[3]   AS 11.41.110(a)(2).

approved by a Probation Officer or by the IDP+ Program"[4] and "totally abstain from use and possession of any drugs not prescribed by a licensed practitioner."

In his sentencing memorandum, the prosecutor proposed amending Special Probation Condition No. 6 to ensure that certain procedural safeguards were complied with. The prosecutor proposed adding the following requirements: (1) that a hearing be held before Charlie's release to determine whether he should be required to take medications; (2) that Charlie's medical provider be approved by a probation officer or by the IDP+ program; (3) that Charlie authorize the release of his mental health records to the Department of Corrections prior to his release from custody on probation; (4) that Charlie provide notification before he discontinues any prescribed medication he is required to take once he is released; and (5) that Charlie abstain from possessing and using any drugs not prescribed by a licensed practitioner.

In his sentencing memorandum and at sentencing, Charlie agreed that the prosecutor's suggestions remedied "most of the constitutional concerns" with the probation condition, with one exception: the requirement that Charlie's medical provider be approved by a probation officer or the IDP+ program. Charlie argued that requiring the Department of Corrections to approve his medical provider infringed on his constitutional right to privacy in making independent medical decisions.

In response, the prosecutor argued that the challenged provision was narrowly tailored and survived special scrutiny because it did not prevent Charlie from selecting his own practitioner. Rather, it simply created an approval process to prevent Charlie from picking an inappropriate or unqualified practitioner.

The superior court agreed that the probation officer might have a valid concern with Charlie's selection of a practitioner. The court therefore suggested adding

---

4 The Institutional Discharge Program Plus ("IDP+") is a Department of Corrections program for probationers with severe mental illness. The program includes release planning and medication management.

a sentence that allowed for a hearing if the State disagreed with Charlie's selection. The court explained that "both parties can present their evidence and he can have a hearing," and "if there's a determination made by a court at that time that the medical provider isn't qualified or for some reason isn't appropriate, then Mr. Charlie can select somebody else."

The prosecutor agreed that such a modification would resolve the issue. Charlie agreed that the proposed modification was consistent with caselaw, but he maintained his objection to the approval requirement. The court ultimately approved the following version of Special Probation Condition No. 6:

> Prior to release from custody on probation, the defendant shall request a hearing to determine if he should be required to ingest, take or inject medications as prescribed by a licensed practitioner who has been selected by Mr. Charlie and approved of by the Probation Officer, or the IDP[+] Program. If the Probation Officer or the IDP[+] Program does not agree with Mr. Charlie's selection of a medi[c]al practitioner, they may file a request for a hearing. Also, 60 days prior to release from custody on probation, the defendant shall sign a Release of Information allowing the Department of Law District [A]ttorney's Office access to any mental health treatment records contained at the Department of Corrections to include medication history. If [the] defendant is out on probation and receiving mental health medi[c]ation under this condition and wishes to terminate taking any medication prescribed by his treatment providers, he shall provide his probation officer with written notice at least 30 days prior to ceasing his medication to allow for a hearing to be held and a judge to decide the issue. The defendant shall totally abstain from the use and possession of any drugs not prescribed by a licensed practitioner.

> This appeal followed.

*Charlie's current challenges to Special Probation Condition No. 6*

On appeal, Charlie raises six challenges to Special Probation Condition No. 6. Because Charlie failed to raise all but one of these challenges before the superior court, he must establish plain error as to those claims.[5] Plain error is error that "(1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial."[6]

1. *Did the superior court apply the correct level of scrutiny to the probation condition?*

Charlie argues first that Special Probation Condition No. 6 is invalid in its entirety because the superior court allegedly failed to apply special scrutiny. The State argues that the record shows that the court did apply special scrutiny to the condition. We agree with the State.

As a general matter, probation conditions must be "reasonably related to the rehabilitation of the offender and the protection of the public" (or another recognized objective of criminal administration) and "must not be unduly restrictive of liberty."[7] However, when a probation condition infringes on a probationer's constitutional rights, the condition is subject to "special scrutiny."[8] In applying special scrutiny, the sentencing court "must ensure that the condition is narrowly tailored to avoid unnecessary interference with the constitutional right at issue, and the court must

---

[5]    *State v. Ranstead*, 421 P.3d 15, 23 (Alaska 2018).

[6]    *Id.* (quoting *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011)).

[7]    *Id.* at 19 (quoting *Roman v. State*, 570 P.2d 1235, 1240 (Alaska 1977)); *see also id.* at 20 (clarifying that probation conditions may be based on any of the objectives of criminal administration recognized in the Alaska Const. art. I, § 12).

[8]    *Glasgow v. State*, 355 P.3d 597, 600 (Alaska App. 2015).

affirmatively consider, and have good reason for rejecting, any less restrictive alternatives."[9]

As the parties recognized at the sentencing hearing, Special Probation Condition No. 6 is subject to special scrutiny because it potentially infringes on Charlie's constitutional rights. The United States Supreme Court has recognized a "significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs."[10] "The Alaska Supreme Court has gone further and has held that given Alaska's more protective constitutional guarantees of liberty and privacy, the right to refuse to take antipsychotic drugs is 'fundamental.'"[11] In addition to protecting the right to reject unwanted antipsychotic medication, the Alaska Constitution's guarantees of liberty and privacy also protect a person's "right to make independent medical choices in consultation with a physician"[12] and a person's right to privacy in sensitive personal information related to their physical and/or mental health care.[13]

---

[9] *Id.*

[10] *Sell v. United States*, 539 U.S. 166, 178 (2003) (internal quotation marks omitted) (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)).

[11] *R.A. v. State*, 550 P.3d 594, 597 (Alaska App. 2024) (quoting *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006)).

[12] *Glasgow*, 355 P.3d at 600; *see also Huffman v. State*, 204 P.3d 339, 346 (Alaska 2009) ("We now hold that the right to make decisions about medical treatments for oneself . . . is a fundamental liberty and privacy right in Alaska.").

[13] *See Rollins v. Ulmer*, 15 P.3d 749, 752 (Alaska 2001) (recognizing that Alaska's constitutional right to privacy includes "the right to avoid public disclosure of personal matters and the right to privacy in consulting with a physician and making medical treatment choices") (citing *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977)); *Falcon v. Alaska Pub. Offs. Comm'n*, 570 P.2d 469, 478 (Alaska 1977) (recognizing that "certain types of information communicated in the context of the physician-patient relationship fall within a constitutionally-protected zone of privacy").

Here, both parties alerted the superior court that it needed to apply special scrutiny to the provisions of Special Probation Condition No. 6. On appeal, Charlie acknowledges that the court addressed his objection to the provision that requires him to obtain approval of his chosen medical practitioner. Charlie faults the court, however, for failing to make similar express findings with regard to all of the provisions of the probation condition, including those that Charlie did not challenge.

But the caselaw is clear that, absent a specific objection, a court does not need to make express findings on the record to support imposition of a probation condition.[14] As the Alaska Supreme Court explained in *State v. Ranstead*, it is the sentencing court's obligation to ensure that probation conditions are constitutionally imposed and the court "may not delegate this responsibility to the presentence report even if the defense does not object."[15] But the fact that a sentencing court is required to comply with these requirements "does not mean . . . that a sentencing court must make express findings for or otherwise justify each condition on the record."[16] "Nor does it furnish an exception to the well-established principle that 'a defendant must raise an objection in the trial court in order to preserve that argument for appeal.'"[17]

Here, the record shows that the superior court was well aware that the probation condition required special scrutiny. The superior court made extensive findings that support the need for the probation condition, detailing Charlie's significant mental health and criminal history, as well as numerous instances of his violent behavior, especially when unmedicated. The superior court also made findings about

---

[14] *State v. Ranstead*, 421 P.3d 15, 20-21 (Alaska 2018). Best practices, however, would be to make express findings on the record, particularly when addressing probation conditions that directly infringe on important constitutional rights.

[15] *Id.* at 20 (quoting *Beasley v. State*, 364 P.3d 1130, 1133 (Alaska App. 2015)).

[16] *Id.*

[17] *Id.* (quoting *Johnson v. State*, 328 P.3d 77, 82 (Alaska 2014)).

Charlie's general resistance to taking medication and following treatment recommendations, even though there were some instances of voluntary compliance. The superior court found that "when [Charlie] is not medicated, he presents a clear and present danger to society" and that "there's clear evidence in this case of an unwillingness to take medication while both in and out of custody."

Given this record, we reject Charlie's contention on appeal that the superior court failed to apply special scrutiny to the probation condition as a whole.

### 2. Did the superior court plainly err in requiring Charlie to request a prerelease medication hearing?

Special Probation Condition No. 6 requires, *inter alia*, that "[p]rior to release from custody on probation, the defendant shall request a hearing to determine if he should be required to ingest, take or inject medications as prescribed by a licensed practitioner." As both parties recognize on appeal, this provision was intended to ensure that the State complied with this Court's requirement that a judicial hearing be held *prior* to the administration of compelled medication.[18]

In *Kozevnikoff v. State*, we vacated a medication-related probation condition because it did not provide for an independent judicial hearing until *after* the defendant was forced to comply with the probation officer's order to take psychotropic drugs or face revocation of his probation for failing to do so.[19] We concluded that providing for a hearing that precedes the administration of psychotropic medication

---

[18] *See Love v. State*, 436 P.3d 1058, 1061 (Alaska App. 2018) (remanding to provide for an independent judicial hearing on the medication probation condition *before* defendant is required to either take the medication or face revocation for refusing to do so); *Kozevnikoff v. State*, 433 P.3d 546, 548 (Alaska App. 2018) (holding that an independent judicial hearing must occur prior to the administration of compelled psychotropic medication); *Huff v. State*, 2019 WL 2451009, at *3 (Alaska App. June 12, 2019) (unpublished) (same).

[19] *Kozevnikoff*, 433 P.3d at 548.

gives the defendant "the opportunity to present his own expert testimony, and to argue for alternatives to any medication at all, or to a particular medication."[20] Moreover, because a sentencing court cannot know what medication, if any, will be appropriate when a defendant is released on probation, we directed the court to provide for a "hearing near the date of the defendant's release if the circumstances at that time appeared to justify compelled medication."[21]

Unlike in *Kozevnikoff*, Special Probation Condition No. 6 affords Charlie the opportunity to request a hearing to determine if he should be required to take medication before he is actually required to do so. Therefore, the primary concern that we noted in *Kozevnikoff* — that Kozevnikoff was only afforded an independent judicial hearing after he had actually started taking psychotropic drugs[22] — is not present in Charlie's case. Additionally, Special Probation Condition No. 6 ensures Charlie receives a prerelease judicial hearing that is near in time to his release on probation and therefore alleviates our concern in *Kozevnikoff* that "the trial court could not know at the time of sentencing what medication might be appropriate when the defendant was ultimately released on probation."[23] This is especially true here, since Charlie was sentenced to 55 years to serve and it will be decades before he is eligible for release on probation.

On appeal, Charlie acknowledges that the probation condition properly provides for a prerelease judicial hearing, but he argues that the condition is flawed because it requires *Charlie* to request the hearing. Charlie argues that the *State* should

---

[20] *Id.*; *see also Huff*, 2019 WL 2451009, at *3.

[21] *Kozevnikoff*, 433 P.3d at 548 (citing *Kobuk v. State*, 1987 WL 1357149, at *2 (Alaska App. June 3, 1987 (unpublished)).

[22] *Id.* at 548.

[23] *Id.* (citing *Kobuk*, 1987 WL 1357149, at *2).

be required to request the hearing because it is the State who bears the burden at that hearing of establishing that compelled medication is necessary to achieve the goals of probation.[24]

We agree that it is appropriate for the State to be responsible for scheduling the hearing, especially given Charlie's well-established mental health issues. Charlie's institutional probation officer will be in the best position to know the date of his projected release, and thus when the hearing should take place, and may inform the State if a hearing should be requested.

We accordingly remand this case to the superior court and direct the court to replace the phrase, "the defendant shall request a hearing," with the phrase, "the defendant shall be afforded a hearing," with the understanding that the State will be responsible for requesting the hearing. The court shall also ensure that Charlie has representation for the hearing.

3. *Did the superior court err in requiring the Department of Corrections' approval of Charlie's selection of a medical practitioner given the availability of judicial review if there is a disagreement as to Charlie's selection?*

Special Probation Condition No. 6 assigns the decision of selecting an appropriate medical practitioner to Charlie, but subjects his selection to approval by his probation officer or the IDP+ program. The condition further provides that "if the Probation Officer or the IDP[+] Program does not agree with Mr. Charlie's selection of a medical practitioner, they may file a request for a hearing."

Charlie objected to this approval requirement at sentencing and now renews his objection on appeal. Charlie argues that this requirement infringes on his

---

[24] *See Huff*, 2019 WL 2451009, at *3 (explaining that the State has the burden at the hearing of establishing "not only that the proposed psychotropic medication is appropriate, but also that this medication is the least intrusive method for achieving the goals of probation").

constitutional right "to make independent medical choices in consultation with a physician." But a probation condition can infringe on a defendant's fundamental constitutional rights if it is "narrowly tailored" and the court "affirmatively consider[s]" and has "good reason for rejecting any less restrictive alternatives."[25]

Here, the superior court affirmatively considered deleting the approval requirement as Charlie requested, but determined that some protection against Charlie selecting an inappropriate or unqualified practitioner was necessary. Charlie argues that such a fear is speculative because there is nothing in the record to suggest that he will select an inappropriate medical practitioner. But there is equally nothing in the record to suggest that the Department of Corrections will unreasonably withhold approval of an appropriate medical practitioner.[26] Moreover, should Charlie select an inappropriate practitioner or should the probation officer unreasonably withhold approval of an appropriate practitioner, the issue will go to the superior court judge to decide.[27]

Given the availability of judicial review, we conclude that the superior court acted within its discretion when it imposed the modified approval provision.[28]

---

[25] *Glasgow v. State*, 355 P.3d 597, 600 (Alaska App. 2015).

[26] *Cf. Diorec v. State*, 295 P.3d 409, 418 (Alaska App. 2013) (finding the sentencing court's conclusion that defendant's probation officer will exercise appropriate discretion reasonable).

[27] Charlie argues that, given the current wording of the probation condition, it is not clear that the judge would make the final decision. We agree that the probation condition could be worded more artfully, but we conclude that the court's intent to have the judge resolve any dispute over Charlie's selection of a practitioner is sufficiently clear.

[28] *Allen v. Municipality of Anchorage*, 168 P.3d 890, 895 (Alaska App. 2007) (citing *Parks v. State*, 571 P.2d 1003, 1005 (Alaska 1977)).

*4. Did the superior court plainly err in requiring Charlie to sign a prehearing release of information of his mental health treatment records and medication history?*

Special Probation Condition No. 6 provides, in relevant part:

> 60 days prior to release from custody on probation, the defendant shall sign a Release of Information allowing the Department of Law District [A]ttorney's Office access to any mental health treatment records contained at the Department of Corrections to include medication history.

Charlie did not object to this provision at sentencing and is therefore required to establish plain error.[29] On appeal, Charlie cites to two unpublished cases in which this Court invalidated a probation condition that required the defendant to sign a release of information releasing his medical records to the crime victim's medical providers.[30] He argues that requiring him to sign a prehearing release of information to the District Attorney's Office is a similar invasion of his right to privacy. We disagree.

As the State points out, the apparent purpose of this provision is to ensure that the State is adequately prepared for the prerelease hearing on compelled medication — a hearing that is mandated by our caselaw and at which the State bears the burden.[31] The State also notes that the release is limited to Charlie's mental health treatment

---

[29] *State v. Ranstead*, 421 P.3d 15, 23 (Alaska 2018).

[30] *See Sanchez Rosario v. State*, 2021 WL 386939, at *3 (Alaska App. Feb. 3, 2021) (unpublished) (vacating condition that required defendant to sign a release of medical information to the victim's medical providers but upholding the release of information to defendant's medical providers and probation officer); *Giddings v. State*, 2018 WL 3301624, at *5 (Alaska App. July 5, 2018) (unpublished) (same).

[31] *Kozevnikoff v. State*, 433 P.3d 546, 547-48 (Alaska App. 2018); *Huff v. State*, 2019 WL 2451009, at *3 (Alaska App. June 12, 2019) (unpublished) ("At this hearing, the State has the burden of presenting expert medical testimony to establish, not only that the proposed psychotropic medication is appropriate, but also that this medication is the least intrusive method of achieving the goals of probation[.]").

records and medication history, both of which are relevant to the prerelease hearing. Given these limitations and the apparent purpose, we find no plain error.

We note, however, that a defendant should not be required to provide a release of information to the District Attorney's Office in cases where the defendant is willing to take their prescribed medication and to be subject to a medication probation condition and where the defendant (with the assistance of counsel) knowingly and intelligently waives their right to a full judicial hearing.

5. *Did the superior court plainly err in requiring Charlie to give at least thirty days' notice before stopping medication that he has been ordered to take?*

Special Probation Condition No. 6 also provides, in relevant part:

> If defendant is out on probation and receiving mental health medi[c]ation under this condition and wishes to terminate taking any medication prescribed by his treatment providers, he shall provide his probation officer with written notice at least 30 days prior to ceasing his medication to allow for a hearing to be held and a judge to decide the issue.

On appeal, Charlie concedes that it is reasonable for the probation condition to include a notice requirement so that a judicial hearing can be scheduled if he decides to stop taking the medication as ordered, but he contends that requiring thirty days' notice is "unduly restrictive."

Charlie argues specifically that, given the nature of psychotropic medication, there could be circumstances when a thirty-day delay before stopping his medication could cause long-term health problems. But Charlie ignores the context in which the thirty-day notice will be required. If Charlie's long-term health is actually endangered by a delay of thirty days, presumably, the medical professionals in charge of his care would agree to stop the medication or prescribe alternative medications. In such circumstances, Charlie would indeed not be in violation of the terms of his probation because he would be continuing to take his medication as prescribed. In other

words, the thirty-day delay applies only in circumstances where the treatment has already been determined to be the least restrictive alternative necessary to ensure protection of the public and/or Charlie's rehabilitation and only where Charlie is unilaterally deciding — against the advice of his medical practitioner — that he no longer wants to take the prescribed medication.

Given that the thirty-day notice only comes into play when Charlie unilaterally decides, against medical advice, to stop taking his medication, we do not find plain error. We also expect that the hearing will be held as expeditiously as possible.

6. *Did the superior court plainly err in requiring Charlie to abstain from drugs that were not prescribed?*

The final sentence of Special Probation Condition No. 6 states: "The defendant shall totally abstain from the use and possession of any drugs not prescribed by a licensed practitioner." Charlie objects to this provision, interpreting the term "drugs" broadly to include "common over-the-counter medications such as cold, cough and allergy medications; analgesics; anti-acids; laxatives; and diarrhea medication." But we agree with the State that the more natural reading of the condition in context is that "drugs" means prescription drugs. Accordingly, we find no plain error.

*Additional guidance to trial courts regarding forced medication probation conditions*

By affirming the probation condition in this case as not plainly erroneous, we do not intend to suggest that this somewhat complicated probation condition should become the template for all future forced medication probation conditions. The most important part of the condition is its provision for an independent judicial review prior

to the administration of any forced medication.[32] As long as the probation condition allows for an independent judicial review prior to the administration of any forced medication (and prior to any revocation for failing to comply with the forced medication condition), it will generally pass constitutional muster, even if the condition does not spell out all of the intricacies of how and when the judicial review should occur.[33]

*Conclusion*

This case is remanded to the superior court so that Special Probation Condition No. 6 can be modified to ensure that the State, not Charlie, is responsible for scheduling any prerelease judicial hearing. The judgment of the superior court is otherwise AFFIRMED.

---

[32] *See, e.g.*, *Love v. State*, 436 P.3d 1058, 1061 (Alaska App. 2018) ("If . . . the superior court concludes that the facts justify a probation condition that could potentially require Love to take psychotropic medication against her will, this probation condition must be written in such a way that Love can seek judicial review *before* she is required to take the medication, and before she faces revocation of her probation for refusing to take the medication.").

[33] *Id.*